[PHILADELPHIA, APRIL 29th, 1837.]

## DELANY *against* ROBINSON.

1. The inference of payment of a bond and other specialty from lapse of time, is a presumption of law, and a subject of legal direction : The rebuttal of such presumption by circumstances, is also a matter for the court; though the truth of the facts or otherwise, is to be left to the jury.

2. A judge has a right to analyze the evidence, to present the questions of fact, resulting from it, to the jury, and to express his opinion of its weight—leaving the jury, however, at full liberty to decide for themselves.

THIS case was tried before Mr. Justice KENNEDY at a Nisi Prius, held in Philadelphia after December Term last, and now came before the court on a motion for a new trial.

It was an action of debt, brought by Mary Delany, who survived Ann Delany, against ——— Robinson, executor of the will of Thomas Robinson, deceased, upon a bond given by the testator, dated the 27th of November, 1800, in the penal sum of £979, with condition for the payment of £439 1s. 3d., to Mrs. Margaret Delany. The sum of £100 appeared to have been paid on the 4th of May, 1801. The bond was assigned on the 7th of January, 1831, by Richard Peters, executor of the will of Margaret Delany, to Ann and Mary Delany, her daughters, of whom Ann died before the commencement of the suit. Margaret Delany, the obligee, died in 1813, leaving a will dated the 14th of January, 1813, of which she appointed Richard Peters, Esq. the executor. Thomas Robinson died in 1819, leaving a will, in which also Mr. Peters was appointed the executor. This suit was brought in 1834.

To repel the presumption of payment arising from the lapse of time, the plaintiff called Richard Peters, Esq. who testified as follows:—" I am the nephew of Thomas Robinson, and was intimate with him during his life; my first knowledge of the bond came from him; I can't say when, but it was in consequence of his being exposed as surety of Sharp Delany, who was collector of the port of Philadelphia, and as such, alleged to be largely indebted to the United States; he had a large real estate, supposed at his death to be sufficient to pay his debts, and also a considerable personal estate. General Robinson and the late Alexander Johnston, two of the sureties of Sharp Delany, called on me to act for them as early as 1801, and in that year I went to Washington about the business.

(Delany *v.* Robinson.)

Delany died in 1798 or 1799; his administrators were his two sons Thomas K. and Daniel S. Delany. Daniel went away to Florida, and the administration devolved on Thomas; the late William Lewis was one of the sureties in his administration bond, and I was also employed by the sureties to attend to the business at Washington. There was not much apprehension for the sureties at first, but in 1802, a balance of $67,821 31, was stated against Delany, communicated by a letter from Mr. Dallas, the District Attorney, which was sent by express to General Robinson, then at the Yellow Springs. I cannot state any precise conversation with him, but some time in 1802 or 1803, this bond was spoken of, and I then learned that it was given for the purchase of a small portion of Mrs. Margaret Delany's paternal estate, near Naaman's creek, where her brother, General Robinson, then resided. She was my aunt. It was the only part of her paternal estate unincumbered; all the rest was mortgaged for her husband's debts. On the 10th of November, 1800, Margaret Delany, with all her children who joined in it, conveyed to Thomas Robinson and William Lewis, all the real estate of her husband in Virginia and Delaware. In the Virginia estate she had dower which was relinquished by this conveyance. General Robinson told me he had purchased the Naaman's creek property from Mrs. Delany, and he said the whole property might be swept off to pay her husband's debts to the United States, for which he was liable, and that it would be a hard case. I mentioned this to Mrs. Delany; I don't know when. Her son Thomas, who was her only support, died—and from his death, I was always charged with her interests. It was sometime between 1805 and 1810, that she spoke to me seriously about this bond; it is endorsed for collection. It must have been before 1810. Then I had a conversation with General Robinson; he recurred, to what had passed between us before respecting it, and repeated that it would be a hard case if he were obliged to pay that bond, and lose the property for which it was given. The prospects of Delany's liability were then very gloomy. Mrs. Delany explicitly agreed, that if this property should be taken to pay her husband's debts, she would not exact the bond, and this I communicated to General Robinson; this was about 1810. Mrs. Delany died in 1813; I was her executor. I went to General Robinson and requested him to assist me in making out her inventory. I then again mentioned the bond to him, and he recurred to the understanding as I have repeated it, between him and her; and as I verily believed that his whole estate would be swept away by his liability for Delany, I considered the bond of very little value. After 1820 or 1821, I ceased to have any connection with General Robinson's affairs, except the agency at Washington to sell the Virginia estate. General Robinson died in 1819." A letter from Richard Peters to Thomas Robinson, dated 22d November, 1830, was then proved. Mr. Peters on cross-examination said, "In my agency at Washing-

(Delany v. Robinson.)

ton, I represented at first General Robinson and Colonel Johnston; my first visit there was in 1801, with General Robinson; he left me there a considerable time; afterwards I was there very often; in 1805, the balance claimed to be due was $85,757; General Robinson and Colonel Johnston agreed to allow me $600 a year, and I received a good deal of money from rents of the Virginia estate; there was $100, a fee paid to Mr. Rawle for professional advice in this business, and $100 for services to another person; the amount of the whole compensation agreed to be paid to me, if justly allowed, would be six or seven thousand dollars; my note for $3397, (a balance of $4000,) deducted, leaves due to me upwards of $3000, from the estate of General Robinson, for upwards of thirteen or fourteen years; I was the exclusive agent." Mr. Peters in a subsequent stage of the trial being called again, said he could not tell or say that the bond was for the land only, "but that it might have been for something else as well as the land."

On the part of the defendant, Anthony Robinson testified as follows: "General Robinson was my uncle, and Mrs. Delany my aunt; I was born on the estate at Naaman's creek, and lived there till fifteen or sixteen years old; when she lived in Chester, he used to take her a few things from his farm; she was a widow; her circumstances were straitened; I don't know that she ever owned any property near Naaman's creek; never heard of it; never heard that she had any real property when a widow; she must have had before her marriage: I presume at Naaman's creek, as all the property in that neighbourhood belonged to my grandfather; he owned a large tract there, which was divided among his children." The defendant also gave in evidence the deposition of George Read, jr., taken by commission, stating that he had received payment from the defendant, of $1053, and $42 costs, in satisfaction of the judgment obtained by the United States against him, as executor of Thomas Robinson; together with the testimony of Charles J. Ingersoll, Esq. that that judgment was against Robinson as surety of Delany. The defendant also offered evidence which was objected to and rejected, to show the payment of fees to counsel, and other charges expended in defending Robinson's estate from the claim of the United States.

The plaintiff produced in reply, Alexander Johnston, who proved that he is the son of Francis Johnston, deceased, one of the sureties of Sharp Delany; and as such, contributed with Robinson and his legal representatives, towards the payments made to the United States, as sureties of Sharp Delany.

Judge KENNEDY charged, that although the lapse of 20 years raises a presumption of payment against a bond in law, binding on the jury, yet that is only when the delay is not accounted for; as if

(Delany *v.* Robinson.)

during the 20 years the obligor has acknowledged the debt, or payment has been suspended by agreement—that if Mr. Peters's testimony was believed, the bond was discharged; that there was no testimony to show he was wrong, and that the question for the jury was not whether what he said was too improbable or unreasonable for belief, but what the facts were as sworn to; that whether there was any consideration for the delay was immaterial; it was enough if what took place explained the delay; if so, it repelled presumption of payment: and the Judge instructed the jury, that it was not the fair construction of the agreement proved by Mr. Peters, that Robinson should not pay Delany, if compelled to pay the United States for Delany. The Judge also told the jury, that the consideration was a question of fact; yet there was no evidence of it.

The jury found for the plaintiff, and the defendant moved for a new trial, and filed the following reasons:—

" 1. The Judge rejected legal evidence, viz. proof of payments by the defendant.

2. The Judge misdirected the jury as to the presumption of payment of the bond in suit, as to the question of consideration, and as to the legal operation of the agreement proved for suspending proceedings on the bond.

3. The Judge determined facts."

Mr. *C. J. Ingersoll,* for the motion.

The court declined hearing Mr. *J. R. Ingersoll,* who was for the plaintiff.

GIBSON, C. J., delivered the opinion of the court.

The only error committed in the course of the trial, was the admission of any part of the defendant's credits. Nothing can be clearer than that there was not colour of consideration for Mrs. Delany's agreement not to exact the bond, if the property for the price of which it was given, were taken for her late husband's debt. The promise, being gratuitous as well as executory, could not be enforced; and the defendant cannot *legitimately* complain of the part exclusion of what was wholly inadmissible,

The inference of payment from lapse of time, is a presumption of law, and a subject of legal direction. Every jurist, whether judge or text writer, treats of it as such. The rebuttal of it by circumstances left to the jury for the truth of the fact only, is also for the court. In what respect was it treated otherwise at the trial? The judge directed that the testimony of a particular witness, if true in fact, rebutted the presumption of payment in point of law; and that as there was no evidence in the cause which purported to contradict him, the question depended on his credibility, which was left

(Delany v. Robinson.)

to the jury. That was undoubtedly the point presented by the testimony. The argument for a new trial seems to be rested on a supposed invasion of the jury's province in saying what was evidence and what was not. It is certainly not only the right but, the duty of the judge thus to discriminate for purposes of admission or exclusion; and it is difficult to imagine why he may not do so in summing up. It will not be pretended that a jury may find capriciously and without the semblance of evidence, or that the court may not set aside their verdict for palpable error of fact; and if it may subsequently unravel all they have done, why may it not indicate the way to a wholesome conclusion in the first instance? The superior fitness of a jury to determine facts has lately been so vaunted, that for a judge to open his lips in respect to the weight of testimony, is sometimes frowned upon as a grievance: and the supposed practice of British judges in this particular, is not only put in advantageous contrast with our own; but set forward as the true exponent of the constitutional injunction, that trial by jury shall remain as heretofore. The framers of the constitution, however, we must suppose, took for their model the trial by jury that had theretofore existed in America, without regard to the fluctuations of foreign practice. Beside, it is hazarding little to say that a British judge is not the beau-ideal of judicial delicacy in respect to the business of the jury; nor can he well be when so pressed by the exigencies of despatch as to be frequently compelled to non-suit a plaintiff on his own exhibition of the facts. In no country, I must take leave to say, is evidence examined more cautiously, or with a nicer regard for the rights of the jury, than in our own. As to the superior qualifications of a juror for the determination of facts, it will scarce be pretended that an unpractised mind can be more accurate in its operations than one which has been trained to habits of discrimination by the comparison of circumstances, and whose experience in any other pursuit, would have led to peculiar skill. Yet this mode of trial has decisive advantages over every other; but they are not those that are usually attributed to it by its eulogists. They consist mainly in its publicity, in the popular knowledge of the laws which it disseminates, and in the confidence inspired by popular agency in their administration; and they are undoubtedly so great that civil liberty would not long survive it. But an arbitrary license, on the other hand, would be equally fatal to its usefulness as an instrument of justice in the particular cause. It will be found that counsel who are most jealous of judicial interference, are those who are most dextrous in the manipulation of evidence. It is doubtless unpleasant to the advocate, to have the impressions made by an ingenious speech, effaced by the mechanical but accurate process of the judge who follows him; but it is to be remembered that what is lost by it to the advocate, is gained to justice, which is the superior object of. protection. Without this process of judicial review, causes would

(Delany *v.* Robinson.)

frequently be determined, not according to their justice, but according to the comparative talents of the counsel. To hold the scales of justice even, a judge may fairly analyze the evidence, present the questions of. fact resulting from it, and express his opinion of its weight, leaving the jury, however, at full and entire liberty to decide for themselves. The judge who does no more than this, transcends not the limits of his duty.

Rule discharged.