# Galbraith *against* Galbraith.

After a proceeding in partition, a valuation of the estate by a jury, confirmation of the inquisition, and awarding the estate to one of the heirs, it is not in the power of the orphans' court, to make any subsequent decree or order by which the amount of the liability of the heir to whom the estate was awarded is either increased or diminished.

A release by a guardian of his ward's interest, secured by a recognizance in the orphans' court, after a lapse of twenty-four years, is conclusive against a claim of the ward, although he was an infant at the time, and it may be made to appear that there was a mistake to a small amount in the consideration for which the release was given; particularly when such claim would otherwise affect the interests of a *bona fide* purchaser of land bound by the lien of the recognizance.

After a lapse of twenty-four years the presumption of payment of a recognizance is a conclusive bar to a recovery in an action upon it, although the plaintiff during the greater part of the time was a minor, having a guardian.

When the testimony of a witness upon his *voir dire* leaves it doubtful, whether he be interested or not, the party may resort to other sources of information.

ERROR to the district court of *Lancaster* county.

Walter Franklin, Esq., president of the orphans' court, &c., for the use of Bartram Galbraith against James Galbraith, recognizor, with notice to Andrew Hershy and others, terre-tenants. Debt on recognizance in the orphans' court.

This was an action of debt on the recognizance of James Galbraith, acknowledged on the 23d of April 1808, in the orphans' court, of Lancaster county, for 20,200 dollars, conditioned to pay the widow and children of Bartram Galbraith, deceased, their several and respective shares of the valuation money of the real estate of the deceased, which had been valued and appraised by an inquisition returned to the orphans' court, and by that court confirmed. Bartram Galbraith, for whose use this suit is brought, is one of those children. The widow is still living, and her third part of the valuation remains charged on the decedent's lands.

The children were nine in number, and there was besides a daughter of a deceased child, making the number of shares ten. Samuel S. Galbraith, however, one of the sons, had been advanced in his father's life time, and the plaintiff contends that Josiah, another of the sons, had likewise been advanced to the amount of his share and more, and therefore claims the one-eighth part of the two-thirds of the valuation money, as the share to which he is entitled, deducting 800 dollars therefrom, which he received by his guardian, in August 1810. If Josiah was not advanced, the share of the plaintiff would be one-ninth, instead of the one-eighth. Whether he was or was not advanced, was presented as a question. In the petition of James Galbraith, for a division of this estate, it was alleged that Josiah was advanced. But on the return of the inquisition, when he refused to accept the premises appraised, he reserved his claim to his share of the valuation money, if entitled, on a hearing, thereto; and, subsequently, an issue was directed by the orphans' court, to be tried in the common pleas, in order to test his right. The issue was duly framed and entered in the common pleas, and terminated in 1824, without any trial; so that the question remained to be decided on this occasion. In Mrs Green's deposition it was stated, that he procured his father's indorsements to three notes, drawn by himself, which he sold, and which his father's administrators were afterwards obliged to pay. These, with interest, amounted to about 2000 dollars. His brothers proposed to him to bring his land which his father had given him in Northumberland county, into the general estate, in which case they would concede his right to a share. This he declined, without denying that he had received those lands from his father. When Jacob Hoffman settled with Dr Murray for his wife's share, he did so upon the assumption that he was entitled to the one-eighth part of the value of the land, and consequently that Josiah was not entitled to a share; in other words, had been advanced. Twenty-nine years almost had elapsed since the proceedings in the orphans' court on the return of the inquisition, and the attempt to establish his claim, by or for Josiah Galbraith to a share of the valuation money, seemed to have been abandoned. Upon this evidence, was submitted to the jury, whether he was advanced or not. In their inquisition, the inquest said they had viewed the plantation or tract of land, in the township of Donegal, containing two hundred acres, be the same more or less, of patented land, and that they had valued and appraised this mansion plantation, or tract of land, with the appurtenances, containing two hundred acres, with the allowance, at and for the sum of 60 dollars an acre, and the orphans' court, after confirming the inquisition, ordered the premises to James Galbraith, the three elder brothers declining to accept, upon paying or securing to be paid unto the widow and children of the deceased, their several and respective shares of and in the valuation money of the real estate aforesaid, within one

[Galbraith v. Galbraith.]

year, with lawful interest from this day, *i. e.* the 23d of April 1808, and that he, on this condition, should hold and enjoy the same to him and his heirs in fee, &c. James Galbraith, therefore, entered into recognizance with sureties, each in 20,200 dollars, conditioned as aforesaid. The record or docket of the orphans' court, for 1813, shows the following proceeding: "October the 2d, 1813, on argument and advisement, the court directs, that the distribution of the valuation money in the mansion place of Bartram Galbraith, deceased, supposed in this inquisition to contain two hundred acres, with the allowance, be made agreeably to the actual quantity of land contained therein by admeasurement, with the allowance, instead of the said supposed quantity." By a measurement it was found to contain two hundred and forty-three acres. This entry was transferred to the margin of the record of the proceedings on the return of the inquisition, on the 23d of April 1808. In the interval between these proceedings and the subsequent direction of the court, James Galbraith sold and conveyed the land, as containing two hundred and forty-three acres, to John Pedan, to wit, on the 31st of March 1810, for 17,680 dollars; and John Pedan sold and conveyed the same land, on the 4th of April 1810, for 19,440 dollars, to Jacob Hoffman. Jacob Hoffman's executors, under his will, on the 5th of June 1828, conveyed one hundred and fifty acres of this land to Abraham Hershy, subject to 4860 dollars, the interest thereof to be annually paid to Henrietta Green, widow of Bartram Galbraith, deceased; and Abraham Hershy, the same day, conveyed the same premises, subject to the same sum and interest, to Andrew Hershy, who defends this suit. In the year 1815, a settlement took place between Jacob Hoffman, (who was then living,) and Dr Murray, who had married Elizabeth, one of the daughters and heirs of Bartram Galbraith, deceased. Jacob Hoffman paid him 1215 dollars, with interest, which sum is the one-eighth part of 9720 dollars; the two-thirds of 14,580 dollars, the value of two hundred and forty-three acres of land, at 60 dollars an acre. The first question upon these proceedings was, whether the decree of the 23d of April 1808, and the recognizance of James Galbraith, acknowledged in pursuance of it, bound him to pay Bartram Galbraith, the plaintiff (among others) his share of any definite specific sum.

On the 7th of October 1807, John Foster was appointed guardian of the plaintiff, Bartram Galbraith, and in 1810, he received 800 dollars, and executed a release of the premises bound by the recognizance, in full, upon the basis of the valuation having been 12,000 dollars. This the defendant relied upon as a bar to the action.

The defendant, after the plaintiff had closed his testimony, offered in evidence, a paper purporting to be a release from John Foster, guardian of plaintiff, to James Galbraith, dated the 22d of August 1810, which, after being objected to by the plaintiff's

[Galbraith v. Galbraith.]

counsel, was admitted in evidence. The defendants then offered John Christ, alleging that although he is named in the record, yet it is through mistake. He has no interest, does not own a foot of the land in question, and has so stated by way of plea on the record, and offered to prove by him as follows: That, at the time Jacob Hoffman took the receipt or release from Dr Lackey Murray and wife, he told them he was paying them 400 dollars more than was due to them; that he paid them the sum mentioned in the release in depreciated paper, which was at a discount of from 10 to 15 per cent., and that he had already and before paid to John Pedan the full price of the land, without reference to Dr Murray's claim or lien; that he so stated to Dr Murray at the time, in the presence of Mr Christ, and that he had paid Pedan, believing that Pedan had paid Murray. John Christ being objected to by the plaintiff's counsel on account of his interest, was sworn on his *voir dire*, and testified as follows: I am married to one of Jacob Hoffman's daughters, Elizabeth. He died in 1827. He left seven children; no wife. He made a will in 1826. I and Andrew Hershy were executors. He left one son, who died in 1829. He left a wife and four children. His son's name was John. I got no real estate under the will. We sold the land, one hundred and fifty acres, the Galbraith tract, to Abraham Hershy; part of the tract had been sold by Jacob Hoffman in his life time. Have you any interest in the event of this suit? I do not know that Andrew Hershy will or can come on us. I do not expect the heirs will let Hershy suffer. I attend to the suit for Hershy. He is not in this week. The heirs got about 2200 dollars, or something more. Are you bail or any thing of that kind? back bail, for Andrew Hershy? No, sir; my wife and the other daughters were to get all the residue of the estate, real and personal. This land was sold, subject to the widow's dower, nothing else. There was no agreement between the heirs and Andrew Hershy, that they would pay or satisfy him for any loss occasioned by the claim of the Galbraiths. The counsel for the plaintiff then, further to show an interest in the witness, offered in evidence two deeds, one dated the 5th of June 1828, from the executors of Jacob Hoffman, to Abraham Hershy, and the other from Jacob Hoffman to John Siple and John Smith, dated the 7th of August 1813, to which the counsel for the defendants then and there objected; but the court overruled the objection, and received the deeds; the counsel for the defendants excepting thereto. The counsel for the plaintiff then renewed their objection to the admission of John Christ, on account of his interest in the action trying, and the court sustained their objection and rejected the witness; to which opinion of the court, in receiving the deeds to show an interest after the plaintiff had examined the witness on his *voir dire*, the defendant's counsel excepted.

It was the opinion of the court below, that the proceeding of the

orphans' court, to ascertain the actual quantity of the land, was right, and that the recognizor was bound to pay for the quantity so ascertained. That under the circumstances of the case, the release of the guardian of Bartram Galbraith, in consideration of 800 dollars, was not in the way of the plaintiff's recovery of the amount justly due to him. And they were also of opinion that there were facts in the cause, from which the jury might reasonably account for the lapse of time before suit brought.

Errors assigned.

The court erred in instructing the jury, that the proceedings in the orphans' court, in relation to the partition of Bartram Galbraith's real estate, were not consummated by the decree of the 23d of April 1808, but remained open for the purpose of re-survey, so as to ascertain the exact quantity of land.

In charging the jury, that the decree of the 2d of October 1813, was valid, and operated on Jacob Hoffman and those who claimed title to the premises under him.

In leaving it to the jury to say, that the presumption of payment arising from the lapse of time, was removed by the infancy of the plaintiff, although he had a guardian from the year 1807, and was represented by him, in all the proceedings had in the orphans' court, as well as in those in reference to Josiah's advancement in the common pleas.

In instructing the jury, that the release of the 23d of August 1810, from John Foster, the plaintiff's guardian, to James Galbraith, was no bar to the present action.

In charging the jury, that Jacob Hoffman had, by his acts, acquiesced in and become bound by the decree of the orphans' court, made on the 2d of October 1813, so as to be liable in this suit to the plaintiff, Bartram Galbraith, whose guardian had released in full to James Galbraith, in August 1810.

*Montgomery* and *Ellmaker*, for plaintiff in error.
*Norris* and *Jenkins*, for defendants in error.

The opinion of the Court was delivered by

SERGEANT, J.—The first and principal question in this case is, what is the proper construction of the proceedings in the partition, in relation to the quantity and value of the property taken by James Galbraith at the appraisement. The original petition, describes the property as " a certain plantation, situate on the river Susquehanna, adjoining lands of Jonathan Hoff, John Horst, and Samuel Galbraith, containing two hundred acres, be the same more or less." The inquisition states, that the jury had viewed " a certain plantation and tract of land, situate, lying and being in the township of Donegal, containing two hundred acres, be the same more or less, of patented land;" and afterwards, that they "do value and appraise the mansion plantation, or tract of land, with the appurtenances,

containing two hundred acres, with the allowance, at and for the sum of 60 dollars per acre." The court, therefore, by their decree of the 23d of April 1808, ordered the same to James Galbraith, upon paying or securing to be paid, unto the widow and children of the deceased, their several and respective shares of and in the valuation money of the real estate aforesaid, and recognizance was given in the sum of 20,200 dollars. It was the opinion of the court below, that as the gross amount of the valuation was not specified, but the estimated quantity only given, and the land was merely valued by the acre, and the recognizance was in the sum of 20,200 dollars, conditioned to pay the children's shares of the valuation money; the amount, though not absolutely certain, might be rendered so by a subsequent decree or proceeding.

In this opinion of the court below, we think there was error. There is nothing in the recognizance which can throw light on the question; the amount of it furnishes no guide, and the condition to pay the respective shares, still leaves it doubtful what those shares were. An examination of the numerous decided cases in our own reports will, I think, show, that in the common case between vendor and vendee, on a conveyance of a tract of land, bounded by adjoining owners, and described as a tract containing so many acres, be the same more or less, at a certain price per acre, when there is no stipulation for admeasurement, nor any *mala fides* proved, redress cannot, after the bargain is closed, be given to either party, for a surplus or deficiency subsequently appearing. In Glen *v.* Glen, 4 *Serg. & Rawle* 493, the land was described by boundaries, though vague, and stated to contain "two hundred acres, be the same more or less;" there was a surplus of thirty-one acres and one hundred and forty-one perches; yet, TILGHMAN, C. J., delivering the opinion of the court, held, that the two hundred acres, more or less, were words which implied that the boundaries were fixed, and might contain more than that quantity or less, and it was not an agreement, that two hundred acres should be surveyed and conveyed. In Smith v. Evans, 6 *Binn.* 102, there was a deficiency of eighty-eight acres, in three tracts described as containing nine-hundred and ninety-one acres and allowance, be the same more or less; but the court said it was well enough known, that original surveys contained more than the estimated quantity. Frederick *v.* Campbell, 13 *Serg. & Rawle* 136; Ashcom v. Smith, 2 *Penns. Rep.* 211, and several other cases, concur in the principle. But the present case, seems to be stronger in favour of such construction, than that of a private conveyance. It was the act of a jury, in the performance of a duty delegated to them by law; and that duty was to view the tract, to examine its situation, quantity and quality, and assess a valuation accordingly. After a jury have executed this duty on their oaths, and returned the tract as containing two hundred acres, and affixed to it a certain price per acre, I can perceive no ground, on which it can be asserted, that they

[Galbraith v. Galbraith.]

intended the same price should be affixed to each, and every acre, which the land might afterwards be found to comprise on a strict measurement. If that was their intention, it was their duty to have had the survey made; but as they dispensed with it, without objection that we know of, the presumption must be, they did not intend it. Some of the land may have been barren, and not worth 60 dollars an acre; some may have exceeded it. The part on which the mansion house and buildings were, may have been much more valuable than other portions. It must be supposed, the jury, in pursuance of their duty, went on the ground and examined the patent and its boundaries, and would be aware that the farm exceeded two hundred acres; and if they chose to adopt this mode of assessing it, instead of an actual survey and measurement, and this was known and acquiesced in at the time, and confirmed by the court, it would be unjust that, years afterwards, a new survey should be made, and each, and every acre valued at 60 dollars per acre. A much larger sum might thus be charged on the party, than the jury contemplated, by an *ex post facto* proceeding. It is well known that land has very commonly been sold and disposed of by the tract by individuals, and juries might partake in this generality of description. If this has been done, and the proceeding stands on the record, as the notice of claims to purchasers, sureties and others, it ought so to remain. In Rummel *v* Nichols, 2 *Penns. Rep.* 195, land was taken by an heir, and the inquest described it as " containing two hundred and twenty-seven acres, more or less, with a grist mill and several other buildings thereon erected," and valued at 34 dollars 75 cents per acre, amounting in the whole to 7888 dollars 25 cents, and recognizance was given for that sum. It was afterwards discovered that there was a deficiency of twenty acres and sixty-three perches; yet it was held the defendant was not entitled to any deduction from the recognizance, on account of this deficiency. This case seems to me in effect to decide the present. The circumstance of the amount of the valuation being carried out in a gross sum, is not mentioned in the opinion of Mr Justice Kennedy, as a distinguishing circumstance, but the case was decided on general principles. Nor could it be of importance, because if the quantity of land ought to have been changed, the gross amount would be changed, as a matter of course. We perceive nothing, therefore, in the proceedings or inquisition, which satisfies us that the jury intended, that the mansion tract should be valued at 60 dollars per acre, for each, and every acre thereof, on strict measurement, but are of opinion that it must be taken to mean, as the language imports, a valuation at so much per acre, for the quantity of two hundred acres, be the same more or less.

That this was the understanding of the parties at the time, is deducible from such evidence as we have of the acts which first took place after the inquisition was confirmed. The deed from

[Galbraith v. Galbraith.]

James Galbraith to John Pedan, in March 1810, and from Pedan to Jacob Hoffman, in April 1810, both refer to the valuation as 12,000 dollars; and the release by John Foster, guardian of the present plaintiff, in August 1810, assumes the same basis of settlement. Pedan and Hoffman were purchasers for valuable consideration, and if the amount of the appraisement could be enlarged, it would charge land in their hands with a sum considerably exceeding what they had contracted to pay for it. It was not until October 1813, upwards of five years after the inquisition, and more than three years after James Galbraith had sold and conveyed this tract to a *bona fide* purchaser, as liable only to a valuation of 12,000 dollars, that we perceive an assertion, that the quantity was erroneous, and ought to be corrected. On the 2d of October 1813, the orphans' court ordered, what seems in effect to be an alteration of the inquisition, found by the jury in 1808, and then confirmed by the orphans' court. This they had no power to do. If the inquisition had been deemed defective or uncertain, they might have set it aside, and ordered a new one at any time before confirmation; but they had not jurisdiction by their decree, subsequent to the confirmation, to alter the effect of the finding of the jury. It is not like a decree of a chancellor, which may be reheard in certain cases, on petition or bill of review, for error apparent on its face or since discovered, or the giving a remedy for a defective conveyance. The authority to affix the value of land, taken by an heir at an appraisement, is delegated by act of assembly to the jury, and cannot be exercised by the court, either originally or by an amendatory proceeding. Besides, it does not appear at whose instance the proceeding in 1813, took place, in what mode it was sought, or what parties, or whether any were heard or notified. If such proceeding were valid, it ought to affect only those who had an opportunity to be heard; it certainly ought not to bind purchasers, not parties or privies to it. They ought not to be charged by an order of the orphans' court, made more than three years after their purchase, which varied the extent of the incumbrances upon the land, from the amount at the time of their purchase, and subjected them to the payment, besides the purchase money, of 2,580 dollars more than appeared on the face of the inquisition. They must be considered as having bought on the faith of the record; they had a right to confide in it as importing verity, and titles would be insecure, if incumbrances could be enlarged by subsequent decrees. The order of 1813 can, therefore, have no effect; the original proceeding must alone be regarded, its legal operation ascertained, and the liability of the party ascertained by it.

Nor should the settlement of Jacob Hoffman, in 1815, with Dr Murray and his wife, be permitted to have an influence on the present question. It was an admission of that claim, but not of the present. If Hoffman chose to surrender his right to them, it does not follow that he could be obliged to do so to the other heirs. It

does not appear that he was acquainted with his rights, and it is now certain, that upon the evidence before us, he could not have been compelled to pay Dr Murray and his wife the sum he did pay. It was gratuitous, and cannot be extended beyond the transaction itself; more especially when it would, as in the present case, affect the land in the hands of Andrew Hershy, a purchaser from the executors of Hoffman. The same observations apply to the arrangement made in the deed to Hershy, in respect to the widow's dower. He is to pay the widow, during life, the interest of 4860 dollars; but as to the right of the heirs after her decease, the stipulation in Hershy's deed, so far from admitting their right, expressly calls it in question, and leaves it for future decision. He is to pay to the heirs, at the widow's death, a sum not exceeding 4860 dollars; but if they are not entitled to the whole of it, then the remainder to be paid, at her death, to the executors of Hoffman. As to the two-thirds, not a word is said in the deed, but the whole consideration money is acknowledged to be paid.

I come now to consider the operation of General Forster's release. In 1807 he was appointed guardian of the plaintiff in this suit, then an infant, and on the 23d of August 1810, he executed to James Galbraith (who had recently sold to Pedan) the release in question. This is the first transaction between James Galbraith and any of the other heirs, and exhibits the understanding of James Galbraith, who had taken the land at the appraisement, and of General Forster, who acted as guardian of the plaintiff at that early day, as to the amount of valuation at which the mansion tract had been appraised and taken. This release, in its recitals and sum paid, proceeds on the ground that the valuation was 12,000 dollars, that the plaintiff's share was 800 dollars, and the widow's third 4000 dollars. It nowhere alludes to any omission in measurement, deficiency in quantity, or inadequacy of price. It acknowledges the receipt of the 800 dollars as the plaintiff's share, and releases all shares, &c. of the money and interest, all actions, suits, claims, or demands whatsoever, respecting the same; so that James Galbraith, his heirs and *assigns*, should quietly hold and enjoy the plantation containing two hundred acres, be the same more or less, with the appurtenances, in fee simple, fully and absolutely acquitted and discharged from all and every the shares, &c., and charged with 4000 dollars, the widow's share. Under the proper construction of the inquisition and valuation, the basis assumed by this release was right. It now, however, turns out that Samuel Galbraith's share was advanced in the intestate's lifetime; so that, in truth, the plaintiff was entitled to one-ninth of the valuation instead of one-tenth, viz: 888 dollars 88 cents, instead of 800 dollars. In the absence of any evidence of fraud or imposition, or mistake, further than is inferred from General Forster's receiving 800 dollars instead of 888 dollars 88 cents, as General Forster was fully authorized to act, and capable of informing himself of the rights of his ward, and chose to receive a

less sum in cash, and give a full and formal acquittance of the land, his release would be binding between the parties: it certainly is so as to a purchaser. . This case does not resemble Bixler *v.* Kunkle, 17 *Serg. & Rawle* 298. There it was held, that a release obtained by trustees from *cestui que trusts* residing in another state, on payment to them of about half the amount due to them, was, as between the parties, fraudulent and void. Here James Galbraith, and the purchasers for whom he acted, were not trustees: they occupied an adverse position: the deficiency was but about one-tenth: General Forster was resident here, and the evidence of Samuel's having been advanced, was to be found in the petition and proceedings of the orphans' court, equally accessible to all parties. It is impossible that purchasers who may have trusted to this release could afterwards be made liable by the party who gave it, as if it never had an existence. It must be deemed, as to them, what it purports to be, and would of itself constitute a complete bar to the plaintiff's claim. "It is very clear," says Mr Justice Rogers, in Commonwealth *v.* Brenneman, 1 *Rawle* 336, "that a chancellor would not interpose when the rights of third persons would be affected." It would be a sufficient answer to a bill for relief, that the interest of others was concerned, whether they were judgment or simple contract creditors, purchasers or terre-tenants of the land. And the act of the 15th of April 1828, authorizing releases to be recorded, seems to have been passed for the protection of purchasers and others.

The next question to be considered is, how far the circumstances relied on by the plaintiff rebut the presumption of payment arising from the lapse of twenty-four years from the date of the recognizance to the commencement of this suit. The first circumstance relied on is, the minority of the plaintiff during the greater part of the time. Without laying down any general principle as to the exemption of infants from this presumption, the present case must be decided upon the nature of the authority and duty of guardians under our acts of assembly, concerning the partition and disposition of intestate's estates. By these the guardian is fully empowered and required to act for his ward: he might have sued on this recognizance for the share coming to him in the infant's right, at any time after the expiration of one year from the 23d of April 1808, and the rule is that the presumption runs where the party is under no disability to sue. An executor or administrator would not be exempted from the presumption because minors or feme coverts were interested in the estate. The policy of our law is opposed to the long duration. of liens on real estate: and yet, by the exemption contended for, the lien of the recognizance in the case of an infant heir, might continue for upwards of forty years without legal demand, and then be enforced when all who were conversant of its payment were departed, and every document lost. In the acts of assembly limiting the lien of judgments to five years, there is no

VI.—Q

[Galbraith v. Galbraith.]

saving in favour of infants or others. In the case of Klinker's Appeal, 1 *Whart.* 57, A executed a sealed instrument promising to pay B a certain sum when C, an infant, should arrive at the age of twenty-one years, with interest annually, "in trust for the use of said C." It was held, the lien of this debt on the decedent's estate was gone on the expiration of seven years from the death of A, a a copy of the instrument not having been filed, according to the provisions of the act of 1797. There the legal right of action was in the trustee, and it was his duty to secure the demand by complying with the requisitions of the act of assembly, though the *cestui que trust* was a minor. Here the legal right to sue and the duty of enforcing the plaintiff's right, was in the guardian. The act of assembly made him the representative of the infant in relation to the proceedings in partition, and imposed on him a duty of a peculiar character. A guardian could not be considered as fulfilling his duty to his ward who should allow the moneys due to him on a recognizance, to lie for twenty years without receipt of interest or legal demand. Nor should such an indulgence to him be permitted. It is for the benefit of the ward that the interest should be realised and accumulate, if not required for his maintenance. Nor was the other circumstance, that Josiah Galbraith's share remained undetermined, a rebuttal of the presumption; because the guardian might, notwithstanding, have sued for the plaintiff's share, and recovered so much as he could prove it to be, trying the opposing claim of Josiah in the same manner as he has done in the present action. For these reasons it is our opinion that the lapse of twenty-four years from the date of the release without suit, raises a presumption of payment, and that on this ground also the plaintiff is barred.

As to the admission of the deeds to support the objection to the competency of Christ, we think the court were right in receiving them. The testimony of Christ, (who was a son-in-law of Hoffman, and one of his executors,) on his *voir dire*, left it doubtful whether he was interested or not. He referred to a sale, by Hoffman, of a part of the land, and by Hoffman's executors, of another part, to Abraham Hershy; and being asked whether he had any interest in the event of this suit, answered, he did not know whether Andrew Hershy would or could come upon them: he did not expect the heirs would let Hershy suffer. It was decided, in Shannon v. The Commonwealth, 8 *Serg. & Rawle* 444, that if a witness, on his *voir dire*, answer that he does not know whether he is interested or not, the party has a right to proceed to other sources of information.

Judgment reversed.

NOTE.—Chief Justice GIBSON and Justice ROGERS took no part in this decision, the former being related to one of the parties, and the latter having been concerned in the case when at the bar.