## ESTATE of BRYAN WILKINSON, deceased.

After twenty years, bonds and all debts are presumed paid, and the *onus* is upon those who seek to enforce the claim to rebut this presumption by proof.

If an executor or administrator is cited to settle an account after twenty years, it is a sufficient answer to the citation to avail himself of the legal presumption which arises from lapse of time, that the account has been settled, the assets marshalled, and the money paid over. And the Court will not compel the settlement of an account until there is some proof to repel this legal presumption.

So, if in obedience to a citation, after an account has been settled, showing a balance in the hands of executors, after the expiration of twenty-five years, the administrator of such executor files a statement of the manner in which the assets and balance so found have been distributed, which is in strict accordance with the legal presumption, the *onus* is cast upon the claimant to show that the legacies have not been paid, and the assets distributed; and in the absence of any such proof, especially when all the legatees but one acquiesce in such settlement, and the estate is among near relatives, the Court will presume the settlement and payments were made as stated, until there is something to rebut this presumption.

This legal presumption began to run from the settlement of the account, and the balance for distribution ascertained, and existed when the administrator of the executor filed his statement of the distribution; and the mere filing of such statement, when in accordance with the will and legal manner of distribution, is not a waiver of the legal defence which may have arisen, so as to change the order of proof. But the *onus* is still upon those who seek to recover payment to rebut this presumption, and, in the absence of any fact to overthrow it, this legal presumption will prevail.

Where an estate is notoriously solvent, the debts of the decedent paid, and a former distribution made, the presumption is violent, and in accordance with law, that, after so great a lapse of time, the whole fund has been paid in accordance with the statement so made.

*Nov.* 9. THIS case was presented to the Court, on exceptions to the report of an auditor. Numerous exceptions were filed, and the testimony is of a voluminous and peculiar character. But all the facts, material for a correct understanding of the points decided, are so fully stated in the opinion of the Judge, that any further report of them is deemed altogether unnecessary.

The cause was argued before Judges KING, JONES, and PARSONS; by *Robert Hare*, Jr., for the exceptants, and *Peter M'Call* for the legatees.

The following opinion of the Court was delivered by

PARSONS, Judge.—This case comes before us on exceptions filed to the report of an auditor. For a proper understanding of the question which we are called upon to decide, it becomes necessary to give a brief outline of the facts as reported to us.

It appears that Bryan Wilkinson died in 1796, having first made

his will, by which he makes a division of his estate after the decease of his wife : at what time she died does not appear; nor is it material in the present state of the controversy. By his will, the estate left by the deceased was divided into five parts: one-fifth he bequeaths to his son John, one other to his daughter Esther, one other to his daughter Rebecca, wife of Thomas Holmes, one other to the children of his son Anthony Wilkinson, and the remaining fifth to Hester and Margaret Craig, children of his deceased daughter Elizabeth, the wife of Captain James Craig; Hester having afterwards married Captain John Green ; they are both dead, and their children claim in right of their deceased mother a portion of money out of the estate of their great-grandfather, the said Bryan Wilkinson, deceased; Margaret Craig married John B. Grunat, she surviving him, and likewise makes a claim for a part of the fund now in dispute, in the same way. There were five executors named in the will; but it seems only three of them acted under it, viz. his son John, and his sons-in-law James Craig and Thomas Holmes. It appears that in September, 1801, an account relative to the administration of the estate was settled by John Wilkinson and Thomas Holmes, the surviving executors, and an account by James Ash, administrator of Captain Craig. In the settlement of this account, each executor, and the administrator of Captain Craig, made separate statements of the assets which had come into their hands, and the disbursements made by each. This account was referred to auditors, who, on the 17th of July, 1802, reported a balance due from all the executors to the estate of Bryan Wilkinson, of 10,768$l.$ 9$s.$ 10$\frac{3}{4}d.$

From the year 1801 down to 1826, a period of twenty-five years, no other account was settled, nor is there anything before us which shows that there was any demand for a settlement; nor until after the death of Thomas Holmes, when his executors were cited to settle an account of his executorship on the estate of Bryan Wilkinson. This account was filed on the 5th March, 1827, by John Wilkinson and the executors of Thomas Holmes, in which they state a balance in the hands of the said Holmes and said Wilkinson, during their continuance in the trust, of $9195.66, and likewise state a distribution of this balance among the legatees under the will, giving to each the sum of $1899.33, and to Margaret Grunat $949.56—to Hester Green the same sum, making one share for the two, $1899.33 ; and in this account thus filed, these administrators claim a credit for these sums alleged to have been paid respectively to the legatees.

This account was referred to an auditor, who reported the balance for distribution, $10,682.15, but expressly states that he made no distribution; that power not having, as he says, been given him by the appointment. Subsequently, an auditor was appointed by this Court to make distribution of this balance, who, in 1843, reports that he has made a distribution allotting certain sums to Margaret Grunat, and the children of Hester Green. The auditor makes no distribution among any of the other legatees named in the will, and who are stated, in the account so filed by the administrator of Thomas Holmes, as having received their distributive share in the manner above mentioned. It seems to be admitted by the counsel in argument, that none of the other legatees claim that there is anything due them as having come into the hands of Thomas Holmes, deceased, but they all acquiesce in the settlement made by these administrators.

The entire report of the auditor is excepted to by the legal representatives of Thomas Holmes, and it is contended that it cannot be sustained, either on the facts reported, nor upon the principles of law which ought to govern our decision in a case like this. In the decision of this case, I shall consider the report of the auditor, first, in relation to the facts, or rather the correctness of his conclusions as drawn from the facts; and, secondly, as to the law which arises upon the main facts in the cause.

It appears from the report of this auditor, that after the report of the auditors on the account filed by the executors of Bryan Wilkinson, made 17th February, 1802, and confirmed, numerous receipts for money were produced by the executors of Thomas Holmes, deceased, and the executors of John Wilkinson, deceased (who I suppose have died since the settlement of the account now the subject of dispute), which they alleged were vouchers, showing that the shares of these legatees had been paid, or at least formed a violent presumption of payment. Among these numerous receipts, he allowed for a credit to the accountants but one class, which were receipts for what was called "Flintham and Carolina" money; and these vouchers were allowed, upon the ground that these executors and John Wilkinson had charged themselves in the account with money which they had received from the sale of Flintham wharf and some property in North Carolina. The auditor excludes all the other receipts and vouchers, because they do not on their face purport to be for the distributive share of the claimants under this last account, and draws the inference that these receipts must have been for a distributive share arising from the settlement of the former

account, or were designed for vouchers in relation to some trust estate of the parties. He frankly states, that it is difficult to form correct conclusions in relation to the accounts presented by the parties, and what payments ought to be applied to the distributive share now demanded. No one can deny the great difficulty in deciding with the certainty of much accuracy, as to these transactions between the parties, at this late day, when nearly all the actors in these affairs are now no more, and no survivor to explain the brief written explanations which are found; hence, in my opinion, the propriety of holding those who demand that money be paid, to some proof to establish their claim with very clear testimony.

I think the auditor erred in refusing to allow these vouchers, presented by the accountants as evidence of the payment of the distributive shares claimed by these parties, upon two grounds.

In the first place, I think it very clear that Mrs. Green was paid her share in full, out of the balance in the hands of the executors on the final settlement of these accounts, as stated by the report of auditors in 1802, from facts reported to us; and that it is equally fair to infer, from another state of facts, that Mrs. Grunat was likewise paid her share.

A receipt was produced before the auditor, dated 2d December, 1803, from John Green to John Wilkinson, executor, for $4370, containing these words: "In full for my share of £2100." Now undoubtedly this was for the entire balance due his wife, if not also that due Mrs. Grunat out of the estate, as the account was then settled. The balance reported to be in the hands of the executor for distribution was £10,768, some shillings and pence. That divided into five parts would give to each legatee £2133, some shillings, about the sum stated in the receipt.

It also appears by the report of the auditor, that to March Term, 1803, a suit was brought in the Court of Common Pleas of Philadelphia by the surviving executors of B. Wilkinson, against the administrators of James Craig, deceased, and a judgment recovered for 1795*l*. 19*s*. 5*d*., the balance of money in his hands, as executor of Wilkinson's estate; that the real estate of Captain Craig was sold and purchased in by Mrs. Grunat, then Margaret Craig, and that she gave her bonds, three of which are now produced, to the other legatees under the will of B. Wilkinson, two of which have been paid, and the one given to Thomas Holmes, it is alleged by counsel, is not all paid at this day. The deed by the sheriff was made to Mrs. Grunat, 7th March, 1804. On the 5th of March, 1804, John Green gives to Thomas Holmes and John Wilkinson a

P 2

recept for 400*l.* 8*s.*, one-fifth for the children's share of the estate of James Craig, sold by Sheriff Baker, and 400*l.* 8*s.* more for Anthony Wilkinson's share." If, then, we refer to the facts, that on the 2d of December, 1803, Green had receipted in full for the one-fifth of the estate, and four months after we find Margaret Craig, now Mrs. Grunat, purchasing in her father's real estate, sold on a debt due from her father as the executor, and three of the other legatees taking her bond to each, for their distributive shares of the money, it is fair to infer that the distributive share of each legatee was paid by the executors of Bryan Wilkinson at that time. To my mind it is clear that an entire distribution of the estate found in the hands of the executors, on the settlement of their account, was then made. It appears to me impossible to put any other construction upon their conduct. If there was money coming to Mrs. Grunat, in the hands of Holmes and John Wilkinson, belonging to her under the will of her grandfather, would she have given her bond to each of them? Would her father's estate have been sold if there was money due her and her sister, Mrs. Green, from these executors?

These appear to me the natural inferences arising from the acts of the parties, as they are now presented before us. They were all relatives, claiming out of one common fund in the hands of these three executors. It cannot be doubted that Mrs. Green and Mrs. Grunat have received their portion of that sum which was found in the hands of their father, Captain Craig, on the final settlement of the account, in 1802. If so, it is equally fair to presume that they had also received their one-fifth share of the estate which was found in the hands of Thomas Holmes and John Wilkinson, the other executors. Surely, if it was not paid, how is it possible that Mrs. Grunat should have given to them her bond for £400, when they had money as executors in their hands which belonged to her and her sister, Mrs. Green, as legatees under the will of their grandfather? It is difficult to conceive how such conduct can be explained upon any other theory than the one which has just been indicated, that all the legatees were paid their distributive share. With this view of the case, then, clearly the auditor ought to have given these accountants the benefit of some, if not all, these receipts. But it is said there were other transactions between Holmes, Mrs. Green, and Mrs. Grunat. There was a deed of trust from John Green to Thomas Holmes, making him the trustee for Mrs. Green. But it does not appear from the report of the auditor that the trustee received any money under that

deed; and in the absence of any proof that other money was in his hands, I do not see how those receipts and vouchers ought to be applied to other transactions. If they had relation to other and different transactions *than those* connected with this estate, after this great lapse of time I think the burthen of proof should be cast upon the claimants to show it; and in the absence of such evidence, it would be fair to infer that they were given for money paid on account of this estate.

In this last account settled, and the one out of which the present claim arises, the accountants charge themselves with $10,220.75, money received on account of said estate; and all but $1850 came into their hands prior to the 23d of March, 1805, twenty-one years before there is any demand made for a settlement. Is it fair, then, to suppose these persons would have suffered those executors to have kept so large a sum unless they had paid it over, or were paying it over as it was received? and the last item on the debit side of the account is as far back as May, 1808. In the absence of any proof showing that those receipts were intended for a different transaction, I think the auditor erred in not applying them to this. Hence, on the facts presented before us, this report should be set aside.

But, as there is a question of law raised for our consideration which may be decisive of the whole case, therefore it is not deemed important to devote further time to the consideration of facts.

There is perhaps no principle better settled in Pennsylvania than that, after twenty years, a bond is presumed to be paid, and the same legal presumption applies to mortgages, judgments, legacies, administration accounts, and, in short, to almost every transaction between man and man. This has been deemed necessary, for safety to the rights of parties. I shall not go into an examination of all the cases upon this subject, but will refer to a few in relation to the accounts of executors and administrators.

It was held in the case of Sechrist *v.* Sechrist, 1 Penn. Reports, 420, that the presumption from the lapse of time arose on an administration bond. In that case the bond was given in 1797, an account was settled in 1803, showing a balance in the hands of the administrators, and in 1805 a supplementary account filed, showing a balance in their hands of 1585*l.* 7*s.* 10*d.*, which was not confirmed by the Orphans' Court. But the action was not brought on the bond till 1826, and the Court held it was too late.

It was said, " a presumption of satisfaction from lapse of time arises in case of every species of security for the payment of money,

whether bond, mortgage, judgment, or recognisance ; and the compu-
tation runs from the period when the money was demandable." The
Court there observed that it was unnecessary to say that the limi-
tation would run from the time when the party could first demand
an account, but close the sentence by saying, "*we confidently assert
that the arrest of a judgment actually in progress, strengthens
rather than weakens the presumption of compromise and satis-
faction.*"

In the case of Galbreath *v.* Galbreath, 6 Watts, 112, it was ruled,
after twenty years a recognisance was presumed paid, although the
plaintiff was a minor a great portion of the time.

A similar rule is asserted in Delaney *v.* Robinson, 2 Wharton,
503 ; and in Tilghman *v.* Fisher, 9 Watts, 442, it is held, although
the presumption of payment does not arise in less than twenty
years, yet circumstances may be shown to have occurred, which,
taken in connexion with the time which has elapsed, will render
satisfaction probable and sufficient to justify the jury in giving a ver-
dict for the defendant.

In the case of Foulk *v.* Brown, 2 Watts, 209, it was ruled that
after twenty years the *onus* of proving payment lies on the defend-
ant ; after that time it devolves on the plaintiff to show to the con-
trary, by such facts and circumstances as will satisfy a jury that
there was sufficient cause for the delay.

From these authorities, had John Wilkinson and the executors of
Thomas Holmes, when called upon to settle their account by a cita-
tion, filed for answer that an account was settled in 1801, and that
twenty-five years had rolled by, therefore they were not bound at
that late day to file a further account, most undoubtedly the
Orphans' Court would have given them the benefit of that legal
presumption ; and unless something more had been shown, the ac-
count now the subject of dispute would have never been presented ;
for this Court decided, in the case of Ingraham *v.* Cox, ante, p.
70, that after twenty years we would presume that an admin-
istrator had settled his account, marshalled the assets, and paid
them over as required by law, unless something was shown to rebut
that presumption.

The question now arises, these executors having voluntarily settled
their account, in which they charge themselves with moneys received,
and then claim credits, also credits in the same account for distri-
bution among legatees, showing an entire settlement of the estate ;
does that rebut the legal presumption which had obtained in their
favour ? Is not the *onus* still on the claimants to show that this

distributive share is not paid, as much as it would be if an action had been brought against these executors, and they had relied upon the plea of payment for their defence under the facts now disclosed? I think it does, and when the executors present their account, and in it claim that a legacy has been paid; when the law presumes the satisfaction, they can avail themselves of this legal presumption on a settlement before an auditor, if distribution is demanded.

It may be likened to the case of confessions or acknowledgments, when all that a party says must be taken together. If one says to another that he did owe him a debt, but he has paid it, no one would seriously contend that a suit brought on such acknowledgment of indebtedness could be sustained, unless the plaintiff clearly proved that the payment had not been made. And what more have these executors done? They give a statement on oath, as they allege, how the estate has been settled. In addition to this, they have the benefit of the legal presumption of satisfaction when they file this account, and the law presumes they have disposed of the assets precisely in the manner stated in the account. Who then is to controvert this presumption of law and statement of facts? Surely those who allege the affirmative. But, in the examination of this case, the order of proof seems to have been reversed, and the accountants are asked to take the affirmative, when *prima facie* they have law and facts both on their side. In my opinion, when these executors settled their accounts after the lapse of twenty-five years, and file a statement of the manner in which they have distributed the assets, it is conclusive, until some evidence is introduced by the legatees to controvert it; and no facts being shown by these claimants disproving this disposition of the property by way of rebuttal of the presumption of payment, the auditor ought to have reported against the claimants; and this view of the case, I think, is fully sustained both on principle and authority.

In the first place, a Court of Equity refuses its aid for the enforcement of claims against trustees after a great delay, unless something is shown to account for such neglect. In the second place, this presumption began to run after the settlement of the first account in 1801; it continued on and became complete and a perfect defence after twenty years; its violence of character continued to increase when the executors are called upon for a settlement; they make out an account and file it in strict accordance with that strong legal presumption which the law has given them as a protection, and was a shield from any and all assaults. Does this statement of the affairs of the estate weaken the presumption

23

already certain for them? In my opinion it does not. And why should it, when the law presumes that they did precisely what they state are the facts of the case; a compromise and satisfaction is made to all the legatees? Who controverts the law or the facts? The legatees. Then let them show, by some satisfactory proof, that this legal presumption is not in favour of the accountants. On them, I think, the *onus* is cast to show by the acts or declarations of the accountants, that they are not justified in sheltering themselves behind this legal fortification, the bulwark raised by the law, and acted upon by Courts of Equity, during the current of twenty-five years. In the absence of any countervailing testimony, the Court are bound to protect them from any attack made by the legatees, and not lend that assistance which Courts of Equity refuse. ·I have seen no fact in the cause which weakens or overthrows this presumption, or which would justify the interference of a Court of Chancery. The statement made in their account strengthens rather than weakens their equitable rights. Surely, then, in this state of the controversy, the Court are bound to require proof from the legatees, on the authority of Foulk *v.* Brown, above cited.

The case of M'Lean *v.* Finley, 2 Penna. Rep. 97, is not unlike the present; and the principles ruled by the Court in its decision, seem to control in a great measure this. It was an action brought on an administration bond. The bond was dated 27th March, 1797, and the suit was brought to January Term, 1823. It appeared that on the 9th December, 1805, a statement was filed by the administrators in the Register's office, showing a balance of the proceeds of personal property in their hands amounting to 1449*l.* 5*s.*, for distribution among the heirs; yet it was held by the Court that the action could not be sustained.

The reasoning of the Chief Justice is so forcible, that I am inclined to extract a few remarks from the opinion: he says, "The administrators were bound to settle their accounts, and were consequently *prima facie* liable to make distribution at the expiration of a year; so that the proof of circumstances to prevent the presumption of payment from beginning to run at that time, rested on the plaintiff."

The Court, after deciding that the exhibition of an account which was not confirmed, would not rebut the presumption of payment, thus remark: "But I am not prepared to say that even a decree would arrest the presumption. In adapting general rules to particular transactions, respect must be had to the nature of the

business, and the habits of the persons engaged in it. Now, where the estate is notoriously solvent, it is an undoubted practice to make payments on account, most of the parties entitled being frequently paid off before settlement of the account, which exhibits only the general balance, as previous payments to the distributees do not properly belong to it. There would, therefore, be the same inconvenience and danger of injustice, in requiring the production of vouchers after a great lapse of time, when there has been *an intervening settlement for the satisfaction* of those who had got nothing, as if there had been none."

It appears to me the reasoning of the Court applies with great force in this case. Here is a perfectly solvent estate; large sums of money are received by the executors ; one distribution of a balance in their hands had been made among the legatees ; the debts of the testator had all been paid; these persons before had looked to their rights at an early period after the first account had been settled. Is it not then fair to presume they would have been equally astute in calling upon those executors for a settlement, if the legacy had not been paid? Is not the legal presumption greatly strengthened by this state of facts? To my mind it is. And I think it forms a strong, if not irresistible conclusion, that the legacy was paid; and, in the absence of all proof to the contrary, in my opinion, the law raises this presumption, and the settlement of this account in the manner stated does not rebut it.

We therefore order the report of the auditor set aside, and vacate the appointment.